UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BOUBACAR DIALLO,

                        Plaintiffs

       — against —

IRENA FISHMAN and HARRIS FISHMAN,

                        Defendants.
----------------------------------------------------------------X

**MEMORANDUM and ORDER**

01 CV 1415 (SLT)(MLO)

**TOWNES, United States District Judge:**

In a complaint, dated March 6, 2001, plaintiff, Boubacar Diallo, sues defendants, Irena Fishman ("Irena") and Harris Fishman ("Harris"), alleging causes of action for violations of the Lanhan Act (15 U.S.C. § 1125), breach of contract, unfair competition, fraud, conversion, breach of express warranty, and breach of implied warranty of merchantability. All claims arise out of two alleged transactions involving the sale of containers of Marlboro cigarettes by Irena. The case was tried before the Court without a jury.

As more fully explained below, the Court concludes, based upon the evidence and testimony presented at trial, that plaintiff does not have standing to bring this action. Accordingly, judgment is entered in favor of defendants and against plaintiff. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On January 10, 2000, people came to the home of husband and wife, Harris and Irena. Harris, who was home alone, testified that they left $10,000 as a deposit for cigarettes that they

wished to purchase from Irena. The only person in the group that Harris recognized was a person named Gibril Abdalla. On March 23, 2000, Harris picked up $28,780 on his wife's behalf. (19-20.)[1] He received $50,000 on Irena's behalf on March 24, 2000. On September 14, 2000, Gibril Abdalla left $20,000 with him for Irena. (21.) (*See* plaintiff's trial exhibits 1-4.) At trial, Harris was unable to identify plaintiff as someone who had ever visited his home or left money with him for Irena. (22.) Harris was not involved in any way in Irena's business. (23.) He provided receipts for each sum of money that he received.

Plaintiff testified via an interpreter. He claimed to be a citizen of Guinea who came to the United States in January 2000 looking for a commodity to export to West Africa. He decided to export cigarettes. (24.) According to him, he left the money (for which receipts 1-3 were written) with Harris as payment for cigarettes he wished to purchase from Irena. (29-33.) Plaintiff did not meet or speak with Irena about the purchase. He communicated his request to Mohammad Hissorou, who then communicated with Gibril Abdalla, who communicated with Irena. (39.) On direct examination, plaintiff testified that the money used to purchase the cigarettes was from his bank account in Africa. He intended to pay with money he left at home and cash he brought with him. (29.) When asked by Irena on cross-examination how he was able to bring such large sums of cash into the country, plaintiff stated that he collected the cash from people in the United States who owed it to him. (70.)

Though no terms of any contract were ever placed on the record at trial, plaintiff testified that a twenty-foot container of cigarettes was sent to Africa soon after he made the cash payments. He alleged that he had paid all but $40,000 for the twenty-foot container before he received it. (36.) Although he admitted that he did not inspect the first container, he testified

---

[1]Numbers in parentheses denote page numbers in the trial transcript.

that the cigarettes in the container were "not good"; they were non-conforming. (34.) Since the cigarettes were not satisfactory, plaintiff reached an agreement with the Fishmans that he would send the container and its contents to them in the United States and Irena would return the money. (34.) He never sent the container because "he" would not let him. (41.) Mamadou Diallo advised plaintiff that he would keep the container and try to sell it, but it was never sold. (75.)

After the twenty-foot container arrived in Africa, plaintiff claims that even though he was dissatisfied with the product, he gave Harris an additional sum of $20,000. He was unable to produce a receipt for that amount at trial. (42.) Although he could not remember the date, plaintiff testified that he subsequently returned to the United States. After arrival, he went to the defendants' home, where he met Irena and spoke with her for the first time. (43.) He testified that Irena orally agreed to sell him a bigger container of cigarettes if he paid her $42,000 more. (44.) Harris was present during their conversation, but he was making coffee or tea. (48.) Mohammad Hissorou was also there, and he interpreted for plaintiff, who spoke French, and for Irena, who spoke English. (51-53.) Plaintiff alleges that he paid the defendants a total of $150,000 for cigarettes. Hissorou testified about what he recalled concerning the alleged oral contract, though he could not recall the contract price. (58.) Although Hissorou was alleged to be present for every contact between the Fishmans and plaintiff, he did not testify about any cash payments that he witnessed the plaintiff make to either defendant. (51-60.)

Plaintiff testified that he gave Irena the additional amount of $42,220 in cash on a day when he "went to a house and . . . happened to use the basement." Gibril and Hissorou were also present. (78.) Plaintiff was also unable to produce a receipt for that payment at trial.

At some point, plaintiff again returned to Africa, but he could give no dates. While he was there, the second container arrived. He, Mamadou Diallo, an inspector, named Jean Marc

Darees, and others opened the container in Bangul sometime in 2001. (63.) From that container, the inspector took six packs of cigarettes and he gave plaintiff four packs. Mamadou took those four packs from plaintiff, who kept nothing for himself. (66.)

Irena was employed as a broker who would approach merchants to find desired products for her customers. If she supplied the goods, she received a commission. (116.) She testified that she became involved with the two sales at issue when Gibril called her while she was in Europe. He told her that he was leaving a deposit with her husband for the purchase of cigarettes. (160.) Irena was told that she was dealing with African brokers, a group of three or four men who were acting for a principal. Gibril, with whom she had worked before, was the only one who ever spoke to her. (153, 163.) He asked her for counterfeit cigarettes and brought her samples of what he wanted. (160-61.) She asked Gibril to introduce his principal buyer to her, and Mamadou Diallo came to her home, introduced himself, and negotiated the purchase of the second container of fresh, original cigarettes. (106.) Irena and Mamadou reduced their agreement to a signed writing, dated July 14, 2000. (*See* defendants' Exhibit 2.) Mamadou Diallo did not pay any money for the purchase of the second container of cigarettes. (113.) Mamadou wanted Irena to give him the original bill of lading before he paid, and she refused. Her answer to the complaint contained a fourth affirmative defense that her contract was with Mamadou and that plaintiff has no standing to bring this action. She also testified credibly that she never had any agreement with plaintiff and he never gave her money. (110.) Because she believed Gibril was the broker for Mamadou, she paid Gibril $6,000 after the agreement with Mamadou was signed. (131, 133-34.)

Defendants' Exhibit 9, the deposition testimony of Matar Sosseh, a customs agent in Africa, is particularly revealing. Mamadou and Sosseh are good friends. He asked if he could put Sosseh's name on both the twenty-foot and forty-foot containers to pick them up. Sosseh

agreed. Plaintiff's Exhibits 6 and 7, the respective bills of lading, are each in the name of Matar Sosseh. When the second container arrived, Mamadou did not have the funds to pay, so the container remained on the docks. Sosseh attempted to borrow money to help Mamadou get the container so he could sell it and give Sosseh a percentage of the profit. (230.) His efforts were not successful. The container of cigarettes was finally sold to one Ismail Sibi, who paid "5,000" in demurrage when no one else paid for the container in the time agreed upon. (235-36.)

This Court had the opportunity to observe and hear the testimony of the four witnesses who testified at trial. Upon consideration of all of the evidence presented in the case, this Court finds that the only witnesses who testified credibly were Harris Fishman and Irena Fishman. Their testimony was supported by the deposition of Matar Sosseh, the only witness who was in Africa when the containers arrived, but had nothing to gain or lose as a result of his testimony.

The deposition testimony of Mamadou Diallo and Jean Marc Darees is rejected by this Court as totally lacking credibility. The "Quality Evaluation Reports" submitted by Darees regarding each container is reported on regular paper with no business or professional letterhead, and neither is signed or certified. The Court notes, however, that both reports are issued to Mamadou Diallo, not plaintiff. Additionally, plaintiff did nothing to substantiate Darees' alleged credentials.

Based on the foregoing facts, the Court finds that the plaintiff did not have any contractual relationship with either defendant. He, therefore, had no standing to maintain this action. Further, even if plaintiff had standing, the Court concludes that the evidence submitted was not sufficient to prove any cause of action in the complaint by a preponderance of the credible evidence.

## CONCLUSIONS OF LAW

Article III, § 2, of the United States Constitution confines federal courts to the decision of "Cases" or "Controversies." "Standing to sue or defend is an aspect of the case or controversy requirements." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 63-64 (1997). "Standing" addresses the question whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727, 731 (1972). It focuses primarily "on the party seeking to get his complaint before a federal court," and only secondarily "on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968). "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Beranett v. Spear*, 520 U.S. 154, 162 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)), and *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471-72 (1982).

The evidence submitted at trial proves that if anyone had standing to assert a cause of action against the defendants, it would be Mamadou Diallo. Plaintiff cannot litigate this action for him. As summarized in *Valley Forge, supra*, standing will be denied where a litigant, *inter alia*, rests his claim "on the legal rights or interests of third parties" rather than his own. 454 U.S. at 4742 (citations omitted). Here, Mamadou asked Sosseh to put the containers in Sosseh's name, and he offered to share the profits. Mamadou claimed to have inspected both containers while plaintiff did not. Mamadou decided to keep the first container in order to sell the cigarettes. Both evaluation reports are addressed to Mamadou and not to plaintiff. Finally, Mamadou signed the written agreement which memorializes the contract between him and Irena.

From these facts, this Court infers that the legal rights or interests affected here are those of Mamadou Diallo and not of plaintiff.

Additionally, plaintiff provided three receipts for cash that he argues he paid to Harris in the following amounts: $10,000, $28,780, and $50,000. Even if this Court were to accept plaintiff's claim that he paid those amounts for the twenty-foot container of cigarettes, he would not be entitled to return of those funds. The Uniform Commercial Code specifically provides that acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods, signifies to the seller that the buyer will take and retain them in spite of their nonconformity, or does any act which is inconsistent with the seller's ownership. N.Y.U.C.C. § 2-606(1)(a) and (c). The buyer must pay at the contract price for any goods the buyer accepts. N.Y.U.C.C. § 2-607(1).

In this case, plaintiff testified that he spoke to defendants after that container was delivered. He agreed that he would bring the first container of cigarettes to the United States to Irena. Instead, he decided to give the container of goods to Mamadou, who intended to then try to sell the cigarettes. Because plaintiff did not deliver the goods to Irena as agreed, he had a legal obligation to pay the contract price.

## CONCLUSION

For the reasons stated above, this Court concludes that plaintiff has not sustained his burden of proving that he has standing to institute this action. Accordingly, this Court will enter judgment against plaintiff and in favor of defendants dismissing this action.

SO ORDERED.

Dated: Brooklyn, New York
March 31, 2008

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge